THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
YUBA LaSUMBA, a/k/a Lonnie Dean Murray, a/k/a Lonnie Dean Abdullah,
Defendant-Appellant.

Fourth District    No. 16099

Opinion filed December 30, 1980.

Daniel D. Yuhas and Diana N. Cherry, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Gary J. Anderson and Robert J. Biderman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE MILLS delivered the opinion of the court:

LaSumba walked into the police department, handed the desk officer a motel room key and said, "You will find a body in this room."

They did. His ex-wife.

Dead from stab wounds. A butcher knife lay near the body.

A jury found LaSumba guilty of murder and he was sentenced to 60 years.

## FACTS

At trial, two children of Anna Abdullah (Lillian and Herman Bishop) were called by the prosecution. They testified to the fact that Anna Abdullah and defendant LaSumba had been married for approximately two years and then divorced in 1976. This union produced one child, Hannibal. Lillian Bishop testified that defendant lived at their Champaign home for two months in 1978 and during that time she overheard two arguments between defendant and her mother. According to Lillian, defendant charged his ex-wife with "not taking good care of Hannibal." Lillian said that on Monday, August 28, around 11 at night, she spoke to defendant on the telephone. Since her mother was not at home, defendant left a message that he and Hannibal would "be in in the morning around 11:00." The following morning, Anna Abdullah left the house around 8 or 8:30, saying that she "was going to buy some food stamps and to pick up Hannibal." Lillian Bishop did not see her mother again.

Herman Bishop testified that he used an extension and eavesdropped on the phone conversation between defendant and Anna Abdullah. This occurred several days after defendant had departed their home in the first week of August. Herman said that his mother told defendant to bring Hannibal back within 24 hours or she would call the police.

Defendant testified that he last lived with Anna Abdullah around the end of July 1978. He returned to Champaign a month later to bring Hannibal back to his mother and to appear with Anna Abdullah in civil court concerning a debt of hers that he had cosigned. The night before going to Champaign, defendant phoned the Abdullah home. He left a message saying that he and his son would arrive by bus at 11:30 a.m. Anna Abdullah picked them up at the bus station, and after they got something to eat, she took them to a motel where she had obtained a room for the defendant. Anna took defendant into the motel room so that they could discuss Hannibal, and left their son in the car. According to defendant, Anna Abdullah indicated that she wanted him to keep Hannibal for one more week and he agreed to take Hannibal back to St. Louis. They returned to the bus station and found the next bus would not leave until 4:30 p.m. Anna Abdullah then agreed to let defendant use her car for the trip. He was to return to Champaign that day. The three returned to the motel, because Anna Abdullah decided she might as well use the room she had already paid for. Defendant left for St. Louis around 3:30 p.m., after going into the motel room with his ex-wife for 5 or 10 more minutes.

Defendant recalled that both going to and coming from St. Louis he stopped for gasoline at a station in Raymond, Illinois. At trial, a gas station attendant corroborated these stops.

When defendant LaSumba returned to the motel in Champaign, he discovered Anna Abdullah's body on the floor. Unsure of what to do, he decided to go alert Anna's daughter. He drove to her home but stated that he did not stop the car and go in because "I got this feeling that something was telling me not to go there." Instead, he drove past her house and parked on a side street. He then walked to the police station. On cross-examination, defendant revealed that he had not brought a change of clothes with him when he came to Champaign.

Officer David Brady, of the Champaign Police Department, testified that shortly after midnight on August 30, 1978, he was working at the desk at the police department. Defendant approached the desk, handed Officer Brady a common motel-type key, and said, "You will find a body in this room." The station dispatcher was thereupon instructed to send a car to the Prospect Motel, where Anna Abdullah's body was found.

According to defendant's argument, the time of death set by the State's witness, Dr. Stanley Bobowski, was inconsistent with the State's version of Anna Abdullah's death. At trial, Dr. Bobowski testified that she died an estimated 8 to 10 hours before the autopsy took place. According to this hypothesis, the time of death would have been in the area of 10 p.m. on August 29. The State's other evidence implied that she was killed in the afternoon before the defendant returned to St. Louis. (Although Dr. Bobowski did not give any specific reasons for his estimation of the time of death, we do not find this discrepancy at all fatal to the conviction.)

Defendant contends that the evidence was wholly circumstantial and consistent with his account of events. But we find defendant's version of events to contain many flaws.

(1) Anna Abdullah told her daughter that she was going to pick up Hannibal. Earlier, the victim had told defendant to return Hannibal or she would call the police. This appears inconsistent with the defendant's statement that the victim asked him to keep Hannibal for another week.

(2) Also, it seems strange that Hannibal had to be returned to St. Louis with such immediacy. It would have been more logical for him to have stayed with his mother, or even with defendant, for the short time that defendant had to spend in Champaign.

(3) The State points out that defendant arrived in Champaign on August 29. He was to attend court with the victim on September 1. However, he admitted at trial that he had not brought a change of clothes with him.

(4) The defendant claimed that the victim decided to stay in the motel room while he returned to St. Louis. According to defendant, Anna

Abdullah felt she might as well use the room she had paid for. Yet, defendant retained the key to the room.

(5) According to defendant, the victim's death occurred at approximately 10 p.m. Thus, the victim would have been in the motel room for approximately 7 hours before her death. The State validly attacks this claim by pointing out that the room seemed curiously unused for a stay of that length. The sanitary wrapper was still stretched across the toilet seat. Also, only one cigarette butt of the brand smoked by the victim was found in the room's ashtrays.

(6) We also find it significant that the defendant did not leave Anna Abdullah's car at her home or drive it to the police station. He parked it on a side street.

### SILENCE

The defendant claims that his privilege against self-incrimination was violated and he was denied a fair trial because the State was permitted to raise defendant's silence—both over objection and despite the earlier granting of a motion to exclude—as part of its case in chief. Later in closing argument, the prosecutor referred to this silence. Here's what actually was said:

*"Direct Examination of Officer Brady*

Q. And, after you had advised the dispatcher * * * what did you do?

A. Then I approached the Defendant again. And, I asked him if there was anything else he could tell us that might help us. At that time we didn't know anything.

Q. I am sorry.

A. At that time we didn't know anything. He was just a pedestrian off the street.

Q. When you asked the Defendant that, did he say anything back to you?

(Defense Objection)

* * *

Q. Now, Officer Brady, what did you ask the Defendant at that point?

A. I asked him if there was anything he could tell us that might help us in regard to what he was talking about. At that time we didn't know anything.

Q. Well, without respect to what you knew, did the Defendant supply you with any further information at that point?

A. Not immediately. I got no response. And, then I said, well—

[DEFENSE COUNSEL]: Judge, I would like to make a motion.

[PROSECUTOR]: Could he complete the answer, Your Honor?

THE COURT: Let him complete the answer.

Q. Then, what did you do?

A. Then I pursued it a bit further. I said, 'Well, can you at least tell us if it's a male or a female?'

Q. And, what response did he make then?

A. He said it was a woman.

Q. And, did you have any further conversation with the Defendant at that point?

A. No.

* * *

*Closing Argument*

[PROSECUTOR]: We note from the testimony of Officer David Brady that the Defendant appears in the Champaign Police Department shortly after midnight, that he presents the Officer with a key to Room 2 of the Prospect Motel and tells him that there is a body in that room. And, Officer Brady asks him, 'Is there anything else you can tell us,' gets no response and repeats the question."

A motion for mistrial was made by the defendant, overruled, and the prosecutor resumed:

"The testimony of Officer Brady was that he made the inquiry, received no response and then repeated it saying, 'Is there anything you can tell me such as is it a male or a female,' and the Defendant responded, 'It's a woman.' "

■■ We hold that the admission into evidence of this silence was proper because there was no comment made on the silence. At no time did the prosecution draw an inference of guilty knowledge from defendant's behavior. The defendant's pause was included in a recitation of police procedure. This recitation had probative value as a part of defendant's actions on the day of Anna Abdullah's death.

The difference between a recitation of police procedure and a comment on defendant's silence was delineated in *People v. Foster* (1980), 81 Ill. App. 3d 915, 401 N.E.2d 1221. The prosecutor in *Foster* questioned a security officer about a conversation between the officer and defendant at the police station. The defendant had volunteered certain statements to the officer. The prosecutor asked the officer if the defendant made any other statements. The officer replied negatively. The *Foster* court said that the questioning of the officer was clearly an attempt to elicit all statements made by the defendant at the time of the conversation. This was not an attempt to bring defendant's silence before the jury. The recitation of a conversation between defendant and Officer Brady served a similar purpose in the instant case.

Although the recent case of *Jenkins v. Anderson* (1980), 447 U.S. 231,

65 L. Ed. 2d 86, 100 S. Ct. 2124, dealt with prearrest silence, it does not apply to the situation here. The evidence of silence in *Jenkins* was introduced for the purpose of impeachment. The Supreme Court has clearly carved out a special niche for impeachment evidence. Also, *Jenkins* contained a definite comment upon defendant's silence. The prosecutor attempted to impeach defendant by suggesting that the defendant would have spoken out earlier if he had killed in self-defense. This type of comment is not present here.

### BLOOD TESTS

■ In connection with the scientific evidence introduced at trial, the defendant claims that the State failed to establish the reliability of esterase D testing on aged blood stains from the motel and the butcher knife. As the party seeking to introduce evidence of the test, it was the State's burden to establish that the probative value of the evidence would outweigh any prejudice or confusion that could result from its introduction. We find that the State has amply met this burden. The State's witness, Denise Nielson, a forensic scientist with the Illinois Department of Law Enforcement, testified that she performed the tests on the blood stains in this case. She had performed these tests thousands of times. Nielson said that she bears in mind that there might be some difficulty in typing aged blood stains. She performed the esterase D tests several times until she got a clear result.

According to the defendant, testimony by defense witnesses and information contained in a journal article introduced by the defense indicated that the accuracy of the testing procedure used by Nielson was subject to doubt when performed on aged blood stains. By a motion prior to trial, the defense sought a ruling denying admission of Nielson's testimony concerning her esterase D analysis of blood stains collected in the instant case. After a hearing, the motion was denied. The evidence presented by the defense at this hearing was unimpressive. Dr. Edward Grogg admitted that he had never personally performed this type of test. In fact, he said that he had not realized that this type of work had become so advanced until he read several articles provided to him by the defense. Dr. Stanley Bobowski said that he felt these tests were unreliable. However, he admitted that he had not performed these tests for some time.

### CLOSING ARGUMENT

■ Finally, the defendant claims that he was denied a fair trial because the prosecutor exceeded the bounds of proper closing argument. Specifically, the defendant raises four objections to the closing argument. We

have examined each of these instances, do not consider them significant enough to even warrant discussion, and find them to be harmless error.

For the foregoing reasons, we affirm.

Affirmed.

TRAPP, P. J., and GREEN, J., concur.