THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN R. REDMAN, Defendant-Appellant.

Fourth District   No. 4—84—0625

Opinion filed August 7, 1985.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and Denise M. Ambrose, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MORTHLAND delivered the opinion of the court:

The defendant, Steven R. Redman, was charged in the circuit court of Sangamon County with the offenses of rape, deviate sexual assault and armed robbery. He was tried by a jury, convicted on all three charges, and appeals. He contends on appeal that (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erred by allowing the State's expert witness to testify that less than two percent of Caucasians displayed biochemical characteristics such as those of the defendant and those shown by an analysis of a sample of a semen stain taken from the back seat of the victim's car; (3) the State committed reversible error by failing to complete purported impeachment of the defendant; and (4) the trial court erred in prohibiting defendant from introducing evidence that the victim tested positive for oral gonorrhea following the attack.

An extensive recitation of the facts is necessary to resolve the defendant's first contention. The State's evidence showed that on February 26, 1984, the defendant and victim were both at Skateland South, in Springfield. The defendant initiated a conversation with the victim and learned that she had driven her parents' charcoal-gray Buick Regal to the rink, and also learned where it was parked. He asked the victim to remain at the skating rink a little longer and then walked off to the bathroom and never returned. Ron Austin testified that defendant's coat and shoes were missing from their locker but that defendant's car remained in the parking lot. The victim left the rink at about 8:15 p.m., and started to enter her car when a man jumped out from behind the car and put a gloved hand over her mouth. The glove was a work glove which smelled like grease. She saw a knife the man was carrying. The assailant was wearing a face mask and disguised his voice. He was also wearing a greasy jacket with a fur-like collar on it. He told her where to drive and threatened to kill her at least three times. He asked her for money and eventually obtained two $20 bills from her. When asked by him if she had anything else, she told him to take the car and he replied, "I thought you said it was your parents' car." He then forced her to perform fellatio on him and then had vaginal intercourse with her and ejaculated

on the back seat. A search of defendant's premises by police turned up a partially destroyed mask, greasy work gloves and a jacket, similar to the ones worn by the rapist. The victim testified that the jacket was the one worn by the rapist. The defendant told Linda Meatheringham that everyone suspected him of the rape because he owned a mask and he intended to burn the mask before the police learned of it. The defendant, at one time, said he had borrowed $2.50 or $3.50 from his father to go skating, and less than two hours after the rape and robbery he had two $20 bills. Defendant gave different accounts of how he obtained this money. Defendant told police that he left Skateland around 9 or 9:15 p.m., but testified at trial that he left before 8 p.m. The testimony from the State's expert witness was to the effect that defendant was an AB type in the ABO blood classification system, that by using a technique called electrophoresis he was a PGM type 1, and that defendant was a secretor. The expert testified that secretors secrete their blood type and PGM type in their body fluids. The witness analyzed the sample of the semen stain taken and determined that the individual from whom the semen came was an AB blood type, PGM type 1 secretor.

The defendant presented evidence of a neuropsychologist, who testified that defendant suffered from "aphasiac language disorder," a loss or impairment of the power to use words and "retroactive inhibition," a memory lapse whereby recent experiences would diminish the memory of a more remote experience, and that the defendant was inclined to "confabulate," which is the embellishment on a past event in an effort to compensate for memory loss.

Defendant denied asking the victim anything about her car other than if it was a red Nova, and stated that he left Skateland before 8 p.m. and stopped by Mr. J's and visited with Susan Milner, and got home between 9 and 10 p.m. David Paoni came to his house and they went for a drive. He said he got $50 from working on a car and denied showing Paoni two $20 bills. He said the last time he wore the blue jacket the victim identified as being worn by her assailant was five or six years prior to trial, and he denied telling Linda Meatheringham that he intended to burn his mask.

Defendant's girlfriend testified that she never heard either Linda or defendant mention a mask but said she didn't hear the entire conversation between the two.

Defendant's father said he gave him $40 that weekend.

Susan Milner said the defendant came into Mr. J's on February 26 between 8 and 9 p.m. and she talked to him for 15 or 20 minutes.

The defendant called the State's expert witness, who testified

that hairs found on the victim's blouse, socks and shoes, and three pubic hairs recovered from the back seat of the victim's parents' automobile were dissimilar to hair standards taken from the victim and the defendant.

■■ It is essentially from the foregoing evidence that the defendant was found guilty of the offenses. We believe that the circumstantial evidence of defendant's guilt in this case is overwhelming and proves beyond a reasonable doubt that he was the one who committed the offenses against the victim.

It is obvious that the defendant's primary contention on appeal is with the testimony of the expert witness and the use of such testimony by the prosecutor. The expert witness was Debra Fesser. She had a bachelor of science degree, with a major in biology and a minor in chemistry. After college she received one year of training from the Illinois Department of Law Enforcement (IDLE) in her area of specialty, serology, which is the analysis of blood and body fluids, and hair and fibers. She had been with IDLE for four years and eight months at the time of the trial, and had analyzed blood and other body fluids on a regular basis during that time. She testified concerning the ABO blood typing system and also about the PGM typing system. All blood contains PGM (phosphoglucomutase) made of three forms, which are designated PGM type 1, PGM type 2, and PGM type 2-1. The PGM genetic marker can be isolated by a technique called electrophoresis. In this technique a blood sample is placed into a gel one millimeter thick, and an electric current is applied through a powerpack and cooling system. The electric charge causes the enzymes and proteins to separate and form distinctive identifiable bands on the supporting medium. She also testified that 80% of the Caucasian population secrete their blood type and PGM system in their body fluids. Fresh blood and saliva samples are obtained from an individual to determine if he is a secretor or nonsecretor. She was provided with blood and saliva samples from the defendant, and performed tests which produced the conclusion that defendant's blood was AB, PGM type 1, and that defendant was a type 1 secretor. The witness testified further that she analyzed the stain taken from a portion of cloth from the back seat of the victim's parents' car, and found that stain to be semen. Further tests showed that the stain exhibited AB and H activity in the ABO system and PGM type 1. A person with AB type blood could also have H activity but the AB type would predominate.

Fesser also testified that population frequency statistics compiled by the American Blood Banking Association and several regional experiments in typing were recognized as reliable among experts in the

field of serology. According to these statistics, approximately 4% of the Caucasian population has blood type AB and 57% have PGM type 1. By dividing 4% into 57% Fesser concluded that approximately 2.3% of the Caucasian population would have a combination of both factors. She then multiplied the 2.3% by 80%, the percentage of Caucasian individuals shown to be secretors, and arrived at the conclusion that 1.8% of the Caucasian population would exhibit all three characteristics that were in defendant's blood. The State's Attorney, in closing argument, told the jury that since one-half of the population would be female, that less than 1 person in 100 could have been the source of the semen in the back seat of the victim's parents' automobile.

We point out at this time, that there was no objection to Debra Fesser's testimony at trial, no objection to the foundation for the testimony, and no claim of error in the motion for new trial based upon Debra Fesser's testimony. There was no objection to the State's Attorney's closing argument with reference to statistics, and this argument was not challenged as error in the defendant's motion for a new trial.

The defendant calls our attention to *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734, a case which the defendant contends is virtually identical to the case we consider here. The court in *Harbold* questioned the foundation for the testimony of the expert concerning the reliability of electrophoresis in determining the PGM type, and the court in *Harbold* also held that testimony of the statistical probability of matching blood types constituted plain error. Speaking of population frequency statistics, the court said:

"We believe that this testimony tended to exaggerate the conclusiveness of the scientific techniques used in this case. We imply no criticism of the State's experts, for the Illinois Department of Law Enforcement has helped to pioneer genetic marker detection in this country, and may well have a sound basis for zealous advocacy of these techniques. If defendant had raised these apparent inconsistencies, the experts might have qualified their testimony or given a satisfactory explanation. The defense corrected a flaw in the State's evidence in at least one respect, by introducing published population statistics. We cannot hold that electrophoretic detection of genetic markers in field conditions is unreliable as a matter of law, but we believe that some questions as to scientific acceptance of the technique remain unanswered in this record and in the case law." 124 Ill. App. 3d 363, 381, 464 N.E.2d 734, 748.

The conclusion that can be gleaned from *Harbold*, then, with respect to the testimony of Debra Fesser concerning the use of electrophoresis to determine PGM type is that in the absence of objection to foundation and to the testimony itself there is a waiver of any claimed error. The test is not unreliable as a matter of law. The defendant wants us to conclude in the case we now consider that the reliability of this test has not been sufficiently shown and it should be determined to be inadmissible as a matter of law. This we decline to do. Two cases from sister States, *Robinson v. State* (1981), 47 Md. App. 558, 425 A.2d 211, and *State v. Washington* (1981), 229 Kan. 47, 622 P.2d 986, extensively considered the use of electrophoresis in analyzing blood and making comparisons, and both, in well reasoned opinions, accepted the reliability of the electrophoretic technique. In *People v. LaSumba* (1980), 92 Ill. App. 3d 621, 414 N.E.2d 1318, *cert. denied* (1981), 454 U.S. 849, 70 L. Ed. 2d 138, 102 S. Ct. 170, the court considered the admission of Esterase D testing on aged bloodstains using electrophoresis. In that case Denise Neilson, a forensic scientist with the Illinois Department of Law Enforcement, said she had performed such tests thousands of times. Two witnesses testified that the tests were unreliable. The court held that the State met its burden of establishing "that the probative value of the evidence would outweigh any prejudice or confusion that could result from its introduction." 92 Ill. App. 3d 621, 626, 414 N.E.2d 1318, 1322.

The court in *Harbold* got into a most difficult area when considering testimony relating to probabilities. The court said:

"One glaring defect in the State's evidence warrants consideration under Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), which provides for review of plain error affecting substantial rights where the evidence is closely balanced, despite the defendant's failure to bring the matter to the trial court's attention. Mark Stolorow testified that 'the chances of selecting any two people at random from the population and having them accidently have identical blood types in each one of these factors is less than one in 500, that is, what we call the probability of an accidental match is less than one in 500.' We believe that this testimony was irrelevant, beyond the proper scope of expert opinion, and highly prejudicial to defendant." (124 Ill. App. 3d 363, 381, 464 N.E.2d 734, 748.)

The *Harbold* court goes on to say:

"Our concern is more with the impact of the probability statistic upon the jury than the foundation for the testimony. The statistic was patently irrelevant. Probability theory is necessar-

ily silent on the crucial question before the jury: Of the relatively small percentage of the population with consistent characteristics, which one, if any, committed the crime? (*People v. Collins* (1968), 68 Cal. 2d 319, 330, 438 P.2d 33, 40, 66 Cal. Rptr. 497, 504.) Jurors would be hard pressed to explain how the 1-in-500 chance of an accidental match did not equate with a 1-in-500 chance that defendant was innocent. (See Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process*, 84 Harv. L. Rev. 1329, 1355 (1971).) Of course, the statistic means nothing of the sort. Absent a sound basis to limit the number of possible defendants, the defendant here is but one of thousands of people who share these same characteristics. Legion possibilities incapable of quantification, such as the potential for human error or fabrication, or the possibility of a frame-up, must be excluded from the probability calculation." 124 Ill. App. 363, 383, 464 N.E.2d 734, 749.

Three Illinois cases have dealt with the matter of statistics in connection with blood analysis. One of those was *People v. Gillespie* (1974), 24 Ill. App. 3d 567, 321 N.E.2d 398, where the court held that statistical information relating to percentages of blood types in the Caucasian and Negro populations and population as a whole was properly admitted for consideration by the jury, and was germane to the issue of identification.

In *People v. Henderson* (1980), 83 Ill. App. 3d 854, 404 N.E.2d 392, testimony concerning percentages of the population having a particular ABO classification of blood was admitted into evidence and upheld as proper, and lastly, in *People v. Bush* (1981), 103 Ill. App 3d 5, 430 N.E.2d 514, blood samples were typed according to the ABO grouping system, and in some instances, the Esterase D (EsD) system. The defendant there had ABO type A, EsD type 2-1, and an expert testified that the population frequency for ABO-A, EsD2-1 is 8%. Defendant contended that the minimal probative value of this testimony was outweighed by its prejudicial effect. The court held that this testimony was properly admitted. Again, we return to *State v. Washington* (1981), 229 Kan. 47, 622 P.2d 986, where the court held that statistics were admissible as relevant to identification and that any challenge to their reliability went to the weight of the evidence, not its admissibility. In the case before us now we see the challenge to the reliability of the figures the witness Debra Fesser testified to as going only to the weight to be given that testimony.

The prosecutor, in his final argument to the jury, used mathematical statistical probabilities and arrived at the conclusion that less than

one person in 100 would have the same blood characteristics as the defendant. Given the intelligence of those selected for jury duty in this society, it would appear strange to call a statement such as made here by the prosecutor error, when the jury on its own, by a simple mathematical calculation, could arrive at the same conclusion.

There was no objection to the final argument, and, further, the matter was not specified as error in the defendant's motion for a new trial.

■ Normally, when a defendant fails to make timely objections at trial and in his post-trial motion, any error is waived. (*People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091.) The doctrine of plain error, Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), provides an exception to the waiver rule and is applied in cases where the evidence is evenly balanced or where the error was of such magnitude that the accused was denied a fair trial. (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.) We hold here that the evidence and argument challenged by the defendant was not erroneously admitted, but even if it were considered to be error, the evidence of guilt in this case was not closely balanced, and if there was error it was not of such magnitude as to deny the defendant a fair trial.

We would be remiss if we did not mention at this point that the *Harbold* court concluded that that case was a close circumstantial one, and that the effect of the cumulative error there prejudiced that defendant. We can not and do not arrive at that conclusion in the case we now consider.

■ With reference to defendant's third contention at the trial, the State in cross-examining the defendant asked the following questions:

"Q. Isn't it a fact, Mr. Redman, that you made a statement to Matt Dillon that you would like to have sex with [the victim]?

A. No, that was switched around. Matt told me that.

Q. Oh, he made it up. Is that what you're saying?

A. No, I'm not saying Matt made it up, but I'm saying Matt is the one that said that, because he goes out on his girl friend and he goes skatin'.

Q. And you didn't say that—.

A. No, I didn't, sir.

Q. —about [the victim]?

A. No, I didn't. I love my girl friend I have now."

The State then failed to call Matt Dillon back to the witness stand to show that the statement had been made, and thus failed to complete

the purported impeachment. Generally it is error to lay a foundation for impeachment and then fail to substantiate the impeachment by introducing in evidence the impeaching statement. (*People v. Purrazzo* (1981), 95 Ill. App. 3d 886, 420 N.E.2d 461; *People v. Vinson* (1980), 90 Ill. App. 3d 6, 412 N.E.2d 1062.) In order for the failure to complete impeachment to rise to the level of reversible error, the unfounded insinuation that the witness is unbelievable or is lying must be substantial, repeated, and definitely prejudicial. (*People v. Goolsby* (1977), 45 Ill. App. 3d 441, 359 N.E.2d 871; *People v. Strubberg* (1978), 61 Ill. App. 3d 521, 378 N.E.2d 191.) In *Strubberg* (1978), the prosecutor insinuated but never proved that the defendant had told his wife and mother that he had committed the homicide and also insinuated that the wife had related the statement to law enforcement officers. The court concluded that the evidence of guilt was overwhelming and the failure to complete impeachment could not have contributed to the guilty verdict. Here, the defendant did not move to strike the testimony or move for a mistrial when the impeachment was not completed. The insinuation, if any, from the questions asked the defendant was minimal considering his answers to the questions, and the evidence in this case is compelling that the defendant is the man who committed these crimes. We therefore find that the verdicts would not have been different had the questions not been asked, so the error is harmless.

■ For his final claim of error, defendant contends the trial court erred in prohibiting him from introducing evidence that the victim tested positive for oral gonorrhea following the attack. The State filed a motion *in limine* to prevent the defendant from introducing evidence that six days after the assault occurred the victim was diagnosed as having oral gonorrhea. Some 30 days after the occurrence defendant was tested for gonorrhea and the test results were negative. At the hearing on the motion, the State informed the court that approximately two hours after the victim was forced to perform fellatio she was tested for Neisseria gonorrhea and the throat culture was positive. The defendant presented the testimony of Dr. Sergio Rabinovich, a physician for Southern Illinois University Medical School, who was a specialist in internal medicine and infectious diseases but who was not board certified in either of those areas. The doctor testified that the gestation period for gonorrhea is unprecise but it could probably be medically detected 24 hours or more after contact. In most cases, symptoms appear between three and seven days after contact but it could take longer. According to the doctor, penicillin or tetracycline is used to treat people with this disease, and 98% of the

time a patient can be cured of the disease in the one to two minutes it takes to administer two shots of penicillin. The doctor was asked what the probability was for gonorrhea passing from the mouth of a woman infected with oral gonorrhea to the penis of a man as a result of fellatio. The doctor said that it was possible, but the medical literature did not give enough information for him to make a probability assessment. His opinion was that there was a low probability of contagion in oral-genital contact. The State moved that the doctor's testimony be excluded. The trial court allowed the motion *in limine*. This was not error. The doctor here was unable to express an opinion based upon a reasonable degree of medical certainty that the disease would likely be transmitted through oral-genital contact. The time between the attack and the defendant's testing for the disease was so lengthy that the trial court was correct in its determination that the evidence here was lacking in relevancy.

We conclude that the judgment of the circuit court of Sangamon County should be affirmed, and it is hereby affirmed.

Affirmed.

McCULLOUGH and TRAPP, JJ., concur.