THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROGER HENNE, Defendant-Appellant.
Fourth District   No. 4—87—0344

Opinion filed January 26, 1988.

316

Ronald Tulin, of Ronald Tulin, Ltd., of Charleston, for appellant.

Jeffrey K. Davison, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and J. A. C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On April 27, 1987, in the circuit court of Macon County, defendant Roger Henne was found guilty by a jury of the offenses of home invasion and aggravated criminal sexual abuse in violation of sections 12—

11 and 12—14, respectively, of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 12—11, 12—14). On May 15, 1987, the circuit court ordered the victim receive restitution from defendant's bond toward the victim's medical bills, which totalled $9,965.60, and sentenced defendant to 35 years in the Illinois Department of Corrections on both counts, to run concurrently. Defendant appeals. We affirm.

The case arose out of a home invasion in which the victim was beaten and assaulted, resulting in serious injuries. The victim, age 62, testified that on October 29, 1986, around 12:30 a.m., she fell asleep on the couch in her living room. She awoke either from hearing a sound or feeling a presence. She turned on the light and observed defendant standing 15 to 18 feet away, looking at her. She remembered it as though she took a picture. She identified the defendant in court as the intruder.

The next thing she remembers is being beaten. She remembers defendant was wearing leather gloves. She tried to fight back. She scratched him and remembers getting hold of his nose. Her next recollection was waking up in the hospital.

Around October 31, she started remembering defendant's name. Defendant had shoveled snow for her beginning the previous winter, and she had his name written down at the house. She called her brother to find that name. She further testified that at the time defendant shoveled snow, her brother was in Florida. Also, defendant never entered the house when shoveling. On November 4, she observed a videotape of a lineup and picked defendant out of the lineup.

At the time she went to bed, all the doors were locked. The back door has curtains on it so no one can see in. When she went to sleep, all the windows in the basement were closed, and she never gave defendant authority to enter the house.

On cross-examination, she stated she remembered the police showing her pictures. She remembers the defendant's picture was not in one group, but it was in another. She could not remember which officers showed her pictures or what she said to the officers.

She identified a picture of the lineup. Defense counsel pointed out that four of the people in the lineup had short hair. She responded that she does not remember the hair because she was looking at the faces. She maintained the photograph of the person who attacked her, that she kept in her mind, has never left. She also acknowledged having trouble remembering things at the hospital.

The victim's brother, age 66, testified he awoke around 2:30 a.m. on October 29 and went downstairs, finding his sister badly beaten. He called the police. He also identified a picture of the basement window

which was found open with the screen pushed out. The last time he saw the window it was closed. He also identified pictures of the back door of the home, which was found open. A reddish substance was found on the door and lock. The door was locked when he went to bed.

Patrick Campbell, a Decatur police officer, was the first officer on the scene. He went to the hospital and helped collect evidence in the vitullo collection kit. The victim was incoherent at the time he arrived. She could not remember what happened when he tried to speak with her.

George Lebo, a Decatur police detective who specializes in crime scene processing, arrived at the scene on October 29 at approximately 3:15 a.m. He found one window in the house not secure and that was the window in the basement. In the window well outside the window he found a footprint in the turf and dirt. He took a picture of the print and made a plaster of paris cast of it.

He observed bloodstains on the back door and storm door. He also observed bloodstains on the bathroom door, blood pooling and spattering on the bathroom floor, and spattering on the bathroom wall. Bloodstains and hair pins were found in the hallway immediately adjacent to the bathroom. He took samples of the blood and hair found at the scene. He was also present when crime scene technician Dennis Dodwell found an electrostatic footprint in the basement. Lebo also took a picture of this footprint. He also identified a number of pictures showing the injuries to the victim's face.

On November 3, 1986, Lebo received a call from defendant and went to defendant's house. He noticed a gouge-type scratch below the eye on the left side of defendant's nose. He took a pair of cowboy boots belonging to defendant and noticed one boot had a bloodstain on it.

On cross-examination, Lebo admitted that defendant was cooperative in the investigation. When he searched defendant's car, he found a nightstick and some clothing. He testified in the victim's home he found some latent fingerprints on the doorjamb adjacent to the bathroom and on the bathroom door. He stated the measurement of the entire footprint was $10\frac{1}{2}$ inches and the heel was $3\frac{1}{2}$ inches. In open court, he measured defendant's boot and stated it had an overall length of approximately 12 inches and a heel length of approximately 3 inches.

He spoke with the victim the first time on November 1, 1986. At that time, he brought up the possibility of the assailant's being a person that knew the victim. During that visit, the victim mentioned defendant's name. She stated she could not recall what he looked like

but he was the man who had shoveled her snow. He showed her some pictures which did not include defendant, and she stated her attacker was not in the group.

On November 2, 1986, Lebo returned to speak with the victim. He took a group of pictures which contained defendant's, but he did not indicate to her that one was of defendant. She picked out defendant's picture and stated that the picture closely resembled the attacker, but she did not think this was the one. The picture displayed on November 2 had been taken on March 17, 1986.

On redirect, Lebo testified that the edges of the shoe print just faded out, making it difficult to get an accurate measurement.

Dr. Herbert Walter Thompson and Dr. William Simon both testified concerning the victim's injuries. Dr. Thompson saw the victim around 4:20 a.m. on October 29. He observed tears in the vagina. There was an opening between the vagina and urinary bladder. There was also an opening into the abdominal cavity. The wounds were puncture holes the size of his finger. In his opinion, the injuries were caused by a rigid, blunt instrument inserted through her vagina. The injuries could not have been caused by a penis.

The victim was taken to surgery at 4:09 a.m. and returned from surgery at 7:55 a.m. She had other surgery to repair damages to her face and mouth. During this time, she was under general anesthetic which, according to the medical expert, would leave her confused for several days.

Dr. Simon, a specialist in urology, assisted with the surgery. It was his opinion that to cause this type of injury something long and blunt had to be inserted with a lot of force in the victim's vagina.

Dennis Dodwell, a crime scene technician for the Illinois Department of State Police, testified that he arrived at the crime scene around 2:30 p.m. on October 29. At that time, he proceeded to the basement, and by using an electrostatic lifter, he was able to lift a footprint from the concrete floor that was not visible to the human eye.

He then examined the ground floor using a substance called luminol. Luminol causes a luminescent reaction with dried blood which allows the blood to be seen when the room is darkened. His tests revealed two parallel marks, approximately 12 inches apart, going from the bathroom, through the kitchen, dining room, and up to the couch. Footwear marks appeared to be along the parallel lines.

Francis Schultz, a Decatur police officer, testified he interviewed the defendant on November 3, 1986, around 12:26 p.m. after the defendant's arrest, and he had been given the *Miranda* warnings. Defendant said he had been shoveling snow for the victim for several

years. He stated he had been in the house last winter and accurately described the location of the bathroom. Defendant said he could not explain the possible blood on the boots, and, if it was blood, then he would have to face that fact later.

Schultz also observed the gouge mark on defendant's face under his eye. He also observed scratches on defendant's left wrist and arm and on his right wrist and stated they could have been made by fingernails. He also observed scratches on defendant's right hand.

Schultz interviewed defendant again around 3:42 p.m. on the same day. At that time, he advised defendant that it had been confirmed that blood was on the boot. Defendant told him that on October 31 while working on his car, he cut his thumb and possibly that was how the blood got there.

On cross-examination, Schultz admitted that defendant was cooperative and denied any involvement in the crime. Defendant told Schultz that on October 28, he was at a friend's house until 6 p.m. He went to his apartment until 8 p.m. and then to a couple of bars until 11:05 p.m. He arrived home at around 11:30 p.m. and went to bed. His girlfriend was there at that time. Defendant admitted wearing the boots during the evening of October 28.

Krail Lattig was qualified as a forensic scientist expert and testified his specialty includes footwear identification. He stated in shoe comparisons there are class characteristics which involve grouping shoes with shoes of a similar configuration. Individual characteristics, such as nicks, cuts, and wear patterns, can be used to identify an individual shoe. He compared defendant's boot to the plaster cast and came to the conclusion that this boot could have made the print. The plaster cast contained no individual characteristics due to the rough medium in which it was placed. He stated a footprint impression could be affected by a number of things, including the size and weight of the person, how he stands, and how he walks. The plaster cast and the boot have the same class characteristics. There was nothing that would eliminate defendant's boot from making the print.

He also compared the boot to the print which was electrostatically lifted. Again, he could not positively identify the boot as making the print, nor could he eliminate the boot as making it. The concrete floor would have masked any possible individual classifications. He stated a shoe print is not expected to be exactly the same size as the sole of the boot. This is because all the edges may not touch at the same time, and it is difficult to know if the print would be from the tip of the boot to the heel. A person's shifting of his weight would affect the print.

Philip Sallee was qualified as an expert in forensic science special-

izing in serology and testified that his specialty deals with blood, body fluid, and hairs. He tested the scrapings from under the victim's fingernails and determined that the matter under both fingernails contained human blood. The blood found on defendant's boot could have come from the victim but could not have come from defendant. This blood type occurs in approximately 1.2% of the Caucasian population and 1.3% of the black population.

He also examined the hair found at the scene. Thirty hairs from the couch cushion could have come from the victim but not the defendant. One hair fragment could have come from the defendant but not the victim. Two hairs came from neither.

Sallee also identified a blood print of a glove on a pillow case. The State rested.

Dennis Harris, a Decatur police officer, testified first for defendant. He interviewed the victim at the hospital on October 30. At that time, she told him she could not be sure if she could identify her attacker. She appeared sedated and had difficulty comprehending the discussion. On October 31, he showed her some photographs which did not include the defendant, and she did not pick anyone out. She said she did not feel she got a good enough look to identify anyone. Both times, the interviews were terminated at the request of the hospital personnel.

Clifford Cretsinger, a Decatur police officer, spoke with the victim on November 3. He showed her a group of pictures, and she set the defendant's picture aside as she looked through them. She stated that this looked like the person but could not be 100% sure.

Roger Ryan, a Decatur police officer, had shown the victim a videotape of a lineup including defendant. She immediately pointed to defendant, stating that she was 99% sure that he was the one who attacked her.

Michael Applegate, a fingerprint identification expert with the Decatur police, testified he compared some of the recovered latent fingerprints with defendants, and they did not match. He did not compare these fingerprints with the victim, the victim's brother, or anyone else.

At this point, defendant requested some rulings from the court before determining if he would testify. The first question involved the use of an uncounseled misdemeanor theft conviction for impeachment. The court ruled it admissible.

The second question involved whether a statement defendant made to the polygraph examiner, Mark Cheviron, could be used by the State for impeachment purposes. After taking the polygraph examination,

the examiner advised defendant there were some inconsistencies and wanted to know how he would explain them. Defendant responded that he had terrible dreams about hurting people since childhood and it was possible he could have assaulted the victim, but if he did, he forgot about it. The State had argued for the admissibility of this in their case, but the court denied it.

Defendant argued the statement's use would be improper because it would be impossible to use without referring to the polygraph examination. The court ruled that if defendant testified that statement would be admissible for impeachment purposes. Defendant rested without testifying.

The jury found the defendant guilty of home invasion and aggravated criminal sexual assault. At the sentencing hearing, the court found the defendant qualified for an extended-term sentence pursuant to sections 5—5—3.2 and 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2, 1005—8—1) since the victim was in excess of 60 years of age and the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The court ordered the defendant's bond applied towards the victim's medical expenses of $9,965.90. It then sentenced defendant to concurrent 35-year terms in the Illinois Department of Corrections.

Defendant alleges first that he was not proved guilty beyond a reasonable doubt. He argues that the uncertainty of the victim in her initial interviews as to his identification taints her in-court identification. He also suggests that the police procedures led her to select him as the assailant, further tainting the identification. He also argues that there was insufficient corroboration in view of this tainted identification. We disagree.

█▌█ A reviewing court will set aside a guilty finding only if the evidence is so palpably contrary to the finding or so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt about the accused's guilt. (*People v. Reese* (1973), 54 Ill. 2d 51, 58, 294 N.E.2d 288, 291.) In a prosecution for rape or sexual assault, the law requires the victim's testimony to be either clear and convincing or corroborated. (*People v. Reaves* (1962), 24 Ill. 2d 380, 382, 183 N.E.2d 169, 170.) While a conviction cannot be based upon a vague, doubtful, or uncertain identification (*People v. Brown* (1972), 52 Ill. 2d 94, 101, 285 N.E.2d 1, 6), the testimony of a single witness, if it is positive and credible, is sufficient to sustain a conviction even if contradicted by the accused. *People v. Guido* (1962), 25 Ill. 2d 204, 208-09, 184 N.E.2d 858, 860.

█▌ Clear and convincing evidence is not synonymous with uncon-

tradicted or unimpeached testimony. (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 710, 466 N.E.2d 640, 646; *People v. Redman* (1986), 141 Ill. App. 3d 691, 703, 490 N.E.2d 958, 965.) Minor variances in the testimony may occur, and, if so, these variances constitute mere discrepancies going only to credibility. (*Redman*, 141 Ill. App. 3d at 703, 490 N.E.2d at 965; *People v. Wright* (1972), 3 Ill. App. 3d 829, 833, 279 N.E.2d 398, 401.) It is the task of the trier of fact to weigh these discrepancies, and if the discrepancies do not detract from the reasonableness of her testimony, her testimony can be found clear and convincing. *Redman*, 141 Ill. App. 3d at 703, 490 N.E.2d at 965; *Palmer*, 125 Ill. App. 3d at 710, 466 N.E.2d at 645.

■ The evidence reveals the following sequence of events concerning the in-court identification of defendant by the victim. The attack occurred in the early morning hours of October 29. At that time, the victim was dazed and in shock. She told the first officer on the scene she could not remember what happened. On October 30 and 31, Detective Harris interviewed the victim and on October 31 showed her pictures not including defendant's. She picked out no one and was obviously sedated at the time. On October 31, the victim remembered defendant's name. On November 1, she mentioned defendant's name to Detective Lebo but stated she could not recall what he looked like. On November 2, Lebo showed her some photos, and she picked out defendant's picture, which was eight months old, but stated she could not be sure. On November 3, Cretsinger showed her a group of photos including a recent one of defendant. Again, she picked out defendant's picture. On November 4, she was shown a videotape of a lineup and again picked out defendant. Each time, she was not advised which picture was defendant until after she made her selection. At trial, the victim's identification was strong, and she maintained she had a mental picture of her assailant.

This sequence shows the victim's identification was valid. Every time defendant's picture was present, she picked it out. At no time did she pick out anyone else. Also, the name she remembered on October 31 was defendant's. Defendant points to her uncertainty at times. This can be easily explained by the trauma from the critical injuries and the effect of anesthetic. As this court stated in *People v. Palmer* (1984), 125 Ill. App. 3d 703, 709, 466 N.E.2d 640, 645:

> "Defendant fails to recognize the difference between the validity of a witness' identification and the witness' credibility. *** Discrepancies or omissions of detail, however, do not destroy the validity of an identification; rather, they go to the weight of the testimony and are evaluated by the trier of fact."

We conclude the identification of defendant by the victim was clear and convincing.

Even assuming, *arguendo*, that the identification was not clear and convincing, her testimony was sufficiently corroborated. The victim testified she scratched her attacker and grabbed his face near the nose. Her fingernails had human blood beneath them. Defendant had scratch marks on his arms and a gouge mark under his left eye by his nose. A boot print which could have been made by defendant's boot was found at the point of entry. Defendant's boot had blood on it which did not belong to defendant but matched the victim's blood. Defendant told the police he thought the blood was his. This blood type is only found in 1% to 2% of the population.

Defendant had also told Officer Schultz exactly where the bathroom in the victim's house was located even though the victim testified defendant had never been in the house. While defendant points to evidence which is not found or inconclusive, this evidence is sufficient, with the identification by the victim, to sustain defendant's conviction.

■ Defendant next points to various alleged errors which he believes require a new trial. He first asserts the court erred by allowing expert testimony that defendant's boots could have made the prints that were found. He argues that since the testimony is not conclusive, it is of little assistance to the jury and should not have been allowed. We disagree. Expert testimony that is probative and relevant should be allowed. In this case, considering all the different shoe types in existence, the fact that defendant's boots, which he admits wearing that night, could have made the print is relevant. The fact that it could not be positively identified as the boot which made the prints and that measurements of the boot made in court differed from the prints are all factors to be considered by the jury in determining what weight, if any, to give to this evidence.

■ Defendant next believes the trial judge erred in allowing evidence which a pretrial hearing judge allegedly excluded, or, in the alternative, in not granting his motion for continuance. On April 21, 1987, defendant filed and argued a motion for continuance before a pretrial hearing judge, arguing he had just received, pursuant to discovery, Dodwell's police report, and he needed time to prepare since the report dealt with electrostatic procedures. The pretrial hearing judge entered an order which read: "No evidence of any test, finding or report of finding produced and filed of record after April 13, 1987 (trial readiness call) will be admitted into evidence" and denied the motion for continuance. At the trial, the trial judge ruled that since the information in Dodwell's report was mentioned in two other reports

the defendant had received and the fact that Dodwell is not an expert, he could testify along the lines of his report. Dodwell accordingly testified concerning using luminol to find the blood trails and the using of an electrostatic lifter to find a boot print.

The pretrial hearing judge's order was clearly an order to keep new expert testimony out of the case. Dodwell's testimony was not new since it was mentioned in other reports. Defendant knew from the Lebo reports there would be testimony about electrostatic lifting of the print and the use of luminol. Dodwell did not testify as an expert, and the hearing judge's order did not restrict the introduction of this evidence.

The denial of a request for continuance is to be determined under the particular facts and circumstances surrounding the request, which is directed to the sound discretion of the trial court, and the action of the court will not be disturbed on appeal absent an abuse of discretion. (*People v. Pruden* (1982), 110 Ill. App. 3d 250, 258, 442 N.E.2d 284, 290.) Since defendant had this information available from other sources, we find no abuse of discretion. We also note our review of the record establishes that a copy of the report in question was filed with the court in the original answer of discovery on November 20, 1986.

Defendant next contends a limiting instruction given by the court prejudiced him. However, there was no objection by defendant at the time, and this complaint was not contained in his post-trial motion. Therefore, this question has been waived. *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 857.

■ Defendant argues next that he was denied a fair trial because the State intimidated his alibi witness. The police reports filed with the court establish that defendant's girlfriend was arrested and charged with obstruction of justice (Ill. Rev. Stat. 1985, ch. 38, par. 31—4(a)) after giving a statement which conflicted with defendant's. She subsequently gave another statement hedging her previous answers and was released on a notice to appear. She did not testify at the trial, and defendant asserts it is because she was intimidated by this police action.

We note this is raised for the first time on appeal, and is, therefore, waived. (*Pickett*, 54 Ill. 2d at 282, 296 N.E.2d at 857.) Even if we consider the substance, we find no error. Defendant's argument that she was intimidated into not testifying is mere speculation since there is no statement to this effect in the record. For all we know, she did not testify due to her susceptibility of impeachment by her inconsistent statements, or was not called by the defendant for fear of her truthful answers.

■ Defendant next contends the court erred by denying his motion *in limine* concerning his statement to polygraph examiner Cheviron. His motion requested the State not be allowed to impeach him with his statement that he had terrible dreams about hurting people since childhood and that it was possible he could have assaulted the victim, but if he did, he forgot about it. The State responds that since defendant did not testify, he failed to properly preserve this question for review. We agree.

In *Luce v. United States* (1984), 469 U.S. 38, 83 L. Ed. 2d 443, 105 S. Ct. 460, the Supreme Court dealt with a similar situation. There, defendant filed a motion *in limine* to prohibit the government from using his prior convictions for impeachment purposes. The court denied the motion, and defendant did not testify. The court held that to raise and preserve this claim for review, the defendant must testify. The court noted that any possible harm as a result of the trial court's ruling was wholly speculative. It stated that a court's preliminary ruling is subject to change as the case unfolds. Also, because an accused's decision whether to testify seldom turns on the resolution of one factor, a reviewing court cannot assume an adverse ruling on the motion motivated defendant to not testify. Even if these problems could be surmounted, the court found difficulties with the harmless error question. It noted that without defendant's testimony, if the court's ruling was erroneous, it would be impossible to determine if the error was harmless. This meant any error would result in the windfall of automatic reversal. Therefore, the court noted that requiring the defendant to testify would solve these problems and discourage the making of motions *in limine* for the sole purpose of "planting" reversible error to be used in the event of conviction.

In *People v. Redman* (1986), 141 Ill. App. 3d 691, 700, 490 N.E.2d 958, 964, this court found the rationale in *Luce* persuasive and held that since defendant failed to testify, he could not challenge on appeal the trial court's adverse ruling with respect to his motion *in limine* seeking to preclude the State from introducing defendant's prior convictions for impeachment purposes. In the present case, the motion *in limine* involved a prior statement which the State intended to use for impeachment purposes. We find the rationale of *Luce* equally applicable and persuasive to this situation. Therefore, since defendant did not testify, he has not properly preserved this issue and cannot challenge this ruling on appeal.

■ Defendant next argues the testimony of forensic serologist Sallee concerning his tests for the blood type by use of the electrophoresis technique and the percentage of people in the population with

certain blood types was erroneous. These very arguments were made to this court in *People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272. There, we held that this evidence was not erroneously admitted. (*Redman*, 135 Ill. App. 3d at 541, 481 N.E.2d at 1277.) We see no reason to change that ruling now.

Defendant next contends he was denied a fair trial by the State's closing arguments. Improper remarks made during closing argument constitute reversible error where they result in substantial prejudice to the defendant, or where the statements serve no purpose except to inflame the jury. (*People v. Tiller* (1982), 94 Ill. 2d 303, 321, 447 N.E.2d 174, 183, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121; *People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200, 1205.) However, arguments and statements based upon the facts in evidence or upon reasonable inferences drawn therefrom are within the scope of proper argument. (*People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746, 750; *People v. Williams* (1967), 38 Ill. 2d 115, 125, 230 N.E.2d 224, 230.) We have reviewed the argument and find no error.

Defendant argues he received ineffective assistance of counsel. He points to certain specific examples in support of this allegation. The United States Supreme Court enunciated the standard to evaluate the ineffectiveness of assistance of counsel in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which was adopted by Illinois in *People v. Albanese* (1984), 104 Ill. 2d 504, 526, 473 N.E.2d 1246, 1255, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. The standard is that the constitutionally guaranteed assistance of counsel has not been provided if the defendant can prove that counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) A defendant must establish that there is a reasonable probability that but for counsel's unprofessional errors, the result would have been different. (466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) The inquiry into counsel's performance must be whether counsel's assistance was reasonable considering all the circumstances. 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Every criminal defense attorney is subject to second-guessing by his client upon the client's receiving a conviction after trial. The Supreme Court in *Strickland* was aware of this propensity for second-guessing and warned the courts against it, stating that the reviewing court "must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance." (*Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) To assist the lower courts in this decision, the Supreme Court stated:

> "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant first argues his counsel's ineffectiveness is shown by his failure to call nurse Linda Richardson as a defense witness. Notations in the hospital record indicate she might have testified that on October 29, 1986, immediately after the attack, the victim was unable to remember what happened. This evidence would only be cumulative with similar evidence defendant presented, and, thus, we find even if it was error, no prejudice occurred. We recognize that cross-examination could well have elicited evidence of the critical injuries resulting in the memory impairment.

Defendant argues his counsel was ineffective for failing to call his girlfriend, Robin Donaldson, as an alibi witness even though earlier defendant had argued the reason she did not testify was related to intimidation by the police. Our review indicates the likely reason she did not testify is that in her second statement, when confronted with inconsistencies between her statement and defendant's, she made so many hedges and alterations from her first statement that she would be easily impeached. Therefore, we cannot say counsel's conduct was unreasonable.

Defendant next asserts counsel erred in not explaining to the jury, during either the opening statement or in closing argument, that defendant may not testify. Counsel on appeal considers this ineffective assistance. The jury instructions advise the jury that defendant does not have to testify, and the jury should not consider that fact. This is sufficient instruction. While attorneys may debate whether it is better to tell the jury that defendant will not or may not testify, the failure to do so does not rise to the level of unreasonable behavior anticipated in *Strickland.*

Defendant also argues counsel did not sufficiently attack the victim's eyesight. The record clearly establishes that counsel attacked the victim's identification through various means. The victim's courtroom testimony shows she was very strong on her in-court identification. This objection is merely an attempt to second-guess trial counsel. We

find no resulting evidence of ineffective counsel.

Defendant next contends that counsel was ineffective for failing to file a motion to suppress evidence. The evidence resulted from the defendant's 8:45 a.m., November 3, 1987, phone call to Officer Lebo, and the 9:30 a.m. Lebo interview with defendant at defendant's house. Lebo obtained consent to search from defendant and seized various pieces of evidence, including his boots. Defendant was not advised of his *Miranda* rights and was not in custody. During the interview, defendant told Lebo his license was suspended. A police officer was sent to watch defendant's house and arrest defendant if he drove his vehicle.

At 11:30 a.m. on November 3, defendant was arrested for driving with a suspended license. At 12:26 p.m. and 3:42 p.m., defendant was interviewed by Officer Schultz after being advised of his *Miranda* rights. Defendant also signed forms consenting to a strip search of himself and a search of his vehicle after being advised of his rights. Defendant was not taken before a judge until seven days later. Defendant contends these facts are so peculiar that counsel should have filed a motion to suppress.

Under the *Strickland* analysis, it could only be concluded counsel's conduct was objectively unreasonable in not filing the motion to suppress if there is a likelihood that defendant would have prevailed on the motion. If defendant would not have prevailed, then counsel has not erred by not filing the motion. Defendant has not explained how he would have prevailed on a motion to suppress. He only asserts that one should have been filed. Our review of the questioned facts do not show defendant was likely to prevail on the motion. He signed proper consent to search forms for the seized property. It appears he was not advised of his *Miranda* rights by Lebo, but defendant was not in custody at the time, and those statements were not used in the trial. Defendant's statements to Schultz were placed in evidence, but defendant was properly warned prior to making those statements. The evidence does not support defendant's position on the motion to suppress.

Finally, defendant asserts his counsel was ineffective for failing to call him to testify. He notes he denied in his statement to police and again at his sentencing hearing that he committed the offense. He believes this shows his desire to testify. He also notes that in discussion with the court on the motion *in limine*, counsel indicated he wished to receive the court's ruling before he made a decision as to whether defendant may testify. He asserts this indicates counsel made the decision and would not let him testify.

The decision whether to testify is ultimately for the defendant. (*People v. Brown* (1973), 54 Ill. 2d 21, 23, 294 N.E.2d 285, 287.) This decision is made with the advice of counsel, and counsel is free to urge his professional opinion on his client. This decision is a difficult one which is frequently asserted by defendants as an example of ineffective assistance of counsel. Our supreme court has stated:

"By hypothesis, in every case in which the issue is raised, the lawyer's advice will in retrospect appear to the defendant to have been bad advice, and he will stand to gain if he can succeed in establishing that he did not testify because his lawyer refused to permit him to do so." 54 Ill. 2d at 24, 294 N.E.2d at 287.

In this particular case, the record establishes that defendant never complained about not testifying or expressed a desire to testify. We also note there were legitimate reasons for his not testifying. He would be impeached by a prior conviction and his statement to Cheviron. We do not read counsel's statement as indicating he precluded defendant from testifying but simply as counsel desiring the ruling so as to determine what to recommend to defendant on this question. Accordingly, since the decision whether to testify is defendant's, we do not find any ineffectiveness of counsel in defendant's not testifying.

Defendant next contends that counsel's representation at the sentencing hearing was ineffective. The evidence at the sentencing hearing consisted of the presentence report and defendant's testimony. As with all aspects of any trial, other counsel may have proceeded differently, but we do not find the counsel's conduct to be ineffective on this point.

We must note at this time that while we have reviewed each alleged specific incident of ineffective assistance of counsel individually, we also do not find that these complaints, taken as a whole, rise to ineffective assistance. Our review of the record establishes counsel acted with great competence and expertise. While other counsel might have proceeded differently, which is true in every case, we do not find any error caused by counsel's representation.

For the reasons stated above, we affirm the decision of the circuit court of Macon County.

Affirmed.

GREEN, P.J., and SPITZ, J., concur.