THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUTHER CAIN, Defendant-Appellant.

Fourth District    No. 4—87—0452

Opinion filed June 30, 1988.

Daniel D. Yuhas and Allen H. Andrews, both of State Appellate Defender's Office, of Springfield, and Mark D. Lipton, of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, of Champaign, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On May 19, 1987, following a jury trial in the circuit court of Champaign County, defendant Luther Cain was convicted of murder but was acquitted of two counts of armed robbery. He was subsequently sentenced to an extended 80-year term of imprisonment. On appeal, defendant maintains (1) he was denied his right to self-representation; (2) the trial court improperly denied his motion to dismiss based on denial of a speedy trial; (3) the results of electrophoresis testing of evidence were improperly admitted; (4) a wallet taken from his possession upon his arrest for another offense was improperly admitted into evidence; and (5) an extended-term sentence was improperly imposed. We affirm.

The record indicates that on August 22, 1985, defendant, George Davis, and Willie Green (a/k/a Willie Smith, a/k/a Abdullah Kahn), were indicted on four counts of murder and two counts of armed robbery. The indictment alleged the three defendants killed decedent by beating him. On March 31, 1986, each defendant's cause was severed from the others.

At trial, police officer John Schweighart testified that he found decedent's body on the floor of an open garage in Champaign at 10:30 a.m. on July 16, 1985. A bartender from the Old Fashioned Tavern testified that decedent had been in the tavern the previous evening and was ejected because he was involved in a fight with another customer. The bartender indicated he also saw decedent during the late night hours of July 15 and the early morning hours of July 16 in the vicinity of the tavern in the company of several black men. A police officer testified that defendant and Willie Green were two of the black men with decedent.

Police Officer Gene Stephens testified at trial that two children told him they had seen Willie Green carrying what appeared to be a bundle of clothing in the early morning hours of July 16, 1985. He said he obtained a bloodstained pair of blue jeans from a garbage barrel later that day near where Green had been seen. Officer Ron Bryant testified that on July 17, 1985, he obtained a bloodstained white shirt with a blue collar from a Mr. Briles, with whom defendant lived. Diane Schneider, a forensic serologist employed by the State of Illinois, testified that she performed electrophoresis tests on those items of clothing and concluded the bloodstains could have originated from decedent. She also concluded that defendant and Green could not have been the source of the bloodstains.

The victim's mother testified at trial that a wallet, which had been taken from defendant's possession while he was jailed on an unrelated charge, was very much like the one she had given decedent. She said the wallet was not among decedent's belongings given to her after decedent's death.

Police Detective Michael E. Smith testified at trial that he spoke with defendant on July 18, 1985, at Burnham Hospital in Champaign in connection with his investigation of decedent's killing. He said defendant told him: (1) he had heard about the killing; (2) he had spent the evening of July 15 and 16 at several taverns; (3) he was wearing a light blue, long-sleeved shirt that night; (4) he could not recall a conversation he had with Mr. Briles regarding the bloodstained white shirt with a blue collar; (5) he did recall losing his billfold; (6) he said he might know Abdullah Kahn (also known as Willie Green or Willie Smith), and George Davis, but he was not sure; and (7) he did not think he knew decedent, and he definitely had not seen him that night. Smith testified that defendant telephoned him on July 19, 1985, and indicated that after thinking about the matter, he remembered how the blood had gotten on his shirt. Smith said defendant told him he had been playing cards with Abdullah Kahn and George Davis, and

when the three went to the Old Fashioned Tavern to buy some wine, he discovered decedent lying on the ground bleeding where his pant leg had been caught in his bicycle chain. Defendant told Smith the blood on his shirt was from defendant's helping decedent up. Defendant further indicated to Smith that Abdullah and decedent had been arguing, and the last he saw of Abdullah, George Davis, and decedent, they were walking on Park Street between Third and Fourth Streets. There was no evidence that the victim's leg or pant leg had been cut as if by a bicycle chain.

Smith then testified that on August 7, 1985, he returned to the garage where the body was found and obtained a sample of the dirt and debris from the floor of the garage. He stated the purpose of obtaining the sample was for comparison to the dirt found on the blood-stained shirt and jeans. Ron Rawalt, an evidence analyst with the FBI, testified that he examined the clothing and the debris and concluded that the shirt and pants had been in contact with the garage floor where Scott's body was found.

The defendant did not testify, and none of the defense evidence directly refuted the State's evidence.

■ We consider first defendant's contention he was denied his right to proceed without counsel. In *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525, the Court indicated that a defendant is implicitly given the right to self-representation through the sixth amendment. That Court noted that the sixth amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta*, 422 U.S. at 819, 45 L. Ed. 2d at 572, 95 S. Ct. at 2533.

At a pretrial proceeding on May 5, 1986, the trial court denied defendant's request to vacate the court's previous appointment of the public defender to represent defendant but did vacate the appointment of Dr. Arthur Traugott to examine defendant as to his fitness to stand trial. Defendant then asked the court if there was not "a law" whereby he was "entitled to represent himself." Upon the court's response that was so, defendant stated "I choose at this point in time, to represent myself." The court explained to defendant the pitfalls of self-representation to which defendant responded he had nothing to lose, because he was not then "getting adequate representation." Then, after considerable discussion with the public defender, the court again decided to order defendant to submit to a fitness examination by Dr. Traugott.

■ The record does not indicate the circuit court responded di-

rectly to defendant's request for self-representation, but the case proceeded with defendant being represented by the public defender and later by Mark Lipton, an attorney in private practice, appointed by the court. The record contains no indication defendant or any of his attorneys ever objected to the lack of a direct ruling upon his request for self-representation or to defendant's being unable to represent himself. Defendant's post-trial motion made no reference to the court's implicit refusal to allow defendant to represent himself. The motion made a general claim of error in any denial by the court of a pretrial motion of the defense, but such an allegation was too general to raise the issue of denial of defendant's right to proceed without counsel. More particularly, we note that on November 20, 1986, when the court vacated the appointment of the public defender and appointed Lipton, the defendant did not object or renew his request to proceed without counsel.

The issue presented is not one concerning any duty of the court to explain to an accused his right to proceed without counsel. (See *People v. Clark* (1981), 94 Ill. App. 3d 295, 418 N.E.2d 891.) The court acknowledged to defendant he had such a right. Ordinarily, the refusal of a defendant's request for self-representation, absent a showing of the defendant's incompetence to represent himself, would be error. However, the *Faretta* court, in speaking of the representation of a defendant by counsel when that defendant had requested self-representation, has stated "[u]nless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution." (Emphasis added.) (*Faretta*, 422 U.S. at 821, 45 L. Ed. 2d at 573-74, 95 S. Ct. at 2534.) Here, it is clear that defendant acquiesced in the appointment of private counsel. Under these circumstances, defendant is deemed to have waived the claim that he was denied his right to self-representation.

■ We next discuss defendant's assertion that the trial court erred in denying his motion to dismiss for failure to bring him to trial within 120 days as required by section 103—5(a) of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 103—5(a)). Defendant filed his motion to dismiss on March 19, 1987, and a hearing was held on the motion on April 6, 1987.

At the hearing, defendant presented the following evidence: On August 22, 1985, defendant and two others were indicted for murder. Defendant was arrested and taken into custody on January 28, 1986, and has remained in custody continuously from that date. The following sequence of events then occurred prior to defendant's trial in May 1987: (1) on March 3, 1986, defendant filed a *pro se* motion for

appointment of other counsel, alleging his present attorney was incompetent; this motion was heard and denied on March 20; (2) on March 12, defendant filed a motion for a severance; the severance was granted on March 31, and defendant was admonished his motion for severance would toll the speedy trial term; (3) on March 22, defendant filed a motion for change of venue which was denied following a hearing on March 31; (4) on April 22, the State filed a motion for a continuance over defense objection; (5) on April 29, the public defender filed a motion for a fitness examination pursuant to section 104—11 of the Code based in part on defendant's refusal to cooperate with counsel; and (6) on May 5, the trial court, after discussion with defendant concerning his refusal to be examined by a psychiatrist, continued the psychiatric examination, expressing some doubt as to defendant's fitness.

The sequence of events continued as follows: (1) on July 1, 1986, defendant was again in court after refusing to be examined by a psychiatrist, at which time the court appointed a different psychiatrist; (2) on July 28, defendant was examined to determine his fitness; (3) on August 4, the psychiatrist tendered his report to the court indicating defendant should be given the opportunity to work with another lawyer before being found unfit to stand for trial; (4) on August 29, the court held a hearing, apparently to determine the status of defendant's fitness to stand trial; (5) on October 1, the trial court held a hearing to allow the psychiatrist to testify concerning defendant's fitness, and, based on that testimony, the court concluded there was a *bona fide* doubt as to defendant's fitness and ordered the psychiatrist to reexamine defendant; (6) on November 4, 1986, the psychiatrist reexamined defendant and submitted a second report which was consistent with the first; (7) on November 12, at the suggestion of the psychiatrist, the court vacated the appointment of the public defender and appointed private counsel to represent defendant; (8) on November 17, defendant filed a motion for a continuance; (9) on December 19, defendant filed a motion to suppress a statement he had made; (10) on January 22, 1987, he filed a motion to suppress evidence; (11) on February 3, he filed a motion to declare the death penalty unconstitutional; (12) on January 19, the psychiatrist reexamined defendant, and on February 20, based on that report, the court found defendant fit to stand trial; and (13) on March 24, 1987, defendant filed a motion to exclude evidence concerning electrophoresic testing of the blood on the shirt and jeans purportedly belonging to defendant.

Section 103—5 of the Code provides that "[e]very person in custody *** shall be tried *** within 120 days from the date he was

taken into custody unless *delay is occasioned by the defendant."* (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 103—5(a).) Where the delay is attributable to the defendant, the statutory period is tolled. (*People v. Reimolds* (1982), 92 Ill. 2d 101, 440 N.E.2d 872.) "A delay is held to be occasioned by the defendant when the defendant's act in fact caused *or contributed to* the delay." (Emphasis added.) *Reimolds*, 92 Ill. 2d at 106, 440 N.E.2d at 875.

■ The trial court concluded each of the foregoing matters resulted in delay attributable to the defendant. If this determination is supported, the defendant was brought to trial within the 120-day requirement. The trial court is given substantial deference in determining to whom delay is attributable particularly where, as here, discerning which party is primarily responsible for the delay is difficult. (*Reimolds*, 92 Ill. 2d at 107, 440 N.E.2d at 875.) We give that deference to the circuit court here and conclude it did not abuse its discretion in making its determination. *Reimolds*, 92 Ill. 2d at 107, 440 N.E.2d at 875.

■ The thrust of defendant's argument arises from the contention of defendant that section 104—16(a) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 104—16(a)) was violated because defendant was not given a fitness hearing within 45 days of a receipt of Dr. Lawrence Jeckel's report. Inferences might arise from the opinions in *People v. Underwood* (1982), 111 Ill. App. 3d 509, 444 N.E.2d 603, and *People v. Cole* (1978), 66 Ill. App. 3d 210, 383 N.E.2d 613, which would indicate that where an accused has not been found unfit to stand trial and a failure to proceed within the time limits of section 104—16(a) has occurred, the 120-day provision is not tolled after the time limit has expired. However, the evidence here fully supported a determination by the trial court that defendant's refusal to cooperate with the examining physician occasioned the delay during the fitness proceedings. Thus, that delaying conduct was the basis for the tolling of the 120-day period during the fitness proceedings, and the court did not have to rely upon the provision of section 103—5(a) specifically designating the time required for a fitness examination of a defendant as delay attributed to defendant.

The trial court did not err in denying defendant's motion for discharge for denial of his right to a speedy trial.

Prior to trial, one of defendant's codefendants, Willie Green, filed a series of motions to exclude evidence obtained through electrophoresis tests performed on the stains found on Luther Cain's shirt and the jeans found near where Green had been seen. Diane Schneider, the forensic serologist who performed the electrophoresis tests, as stated

previously, concluded the bloodstains could have been from the victim and could not have been from either Green or Cain. Much of defendant's brief is devoted to his contention that, for several reasons, grave error resulted from the admission of this evidence. We note that this testimony merely corroborated the undisputed evidence that defendant had admitted to Detective Smith that the bloodstains on the shirt and jeans were in fact from the blood of the defendant albeit arising under circumstances different than contended by the State. The precedent for the admission of this testimony has been established by decisions of this court in *People v. Bradney* (1988), 170 Ill. App. 3d 839, *People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272, and *People v. LaSumba* (1980), 92 Ill. App. 3d 621, 414 N.E.2d 1318, *cert. denied* (1981), 454 U.S. 849, 70 L. Ed. 2d 138, 102 S. Ct. 170. We determine to follow that precedent.

■ Defendant's argument is premised largely on the theory we should adopt the "disinterested witness" rule adopted in *People v. Young* (1986), 425 Mich. 470, 391 N.W.2d 270, and *People v. Brown* (1985), 40 Cal. 3d 512, 530, 726 P.2d 516, 523, 230 Cal. Rptr. 834, 841. That rule requires that the evidence to establish the acceptance in the scientific community of testing procedures must be given by experts who do not have a vested interest in the reliability of the procedure. No States other than Michigan and California have adopted this rule. We rejected it in *Bradney* and adhere to that decision here.

■ The evidence of the reliability of the tests and the propriety with which they were performed was disputed by the evidence. However, upon the court's proper determination that a sufficient foundation was laid, these issues became issues of fact for the trier of fact. Much argument is made by defendant that the bloodstains were likely spoiled by lapse of time between the occurrence of the killing and the testing. However, Dr. George Sensabaugh, whose competency was not disputed, testified for the State that spoilage in the bloodstains would only cause the test to show inconclusive results rather than false ones.

■ Defendant's next argument is that the trial court should not have allowed the State to introduce into evidence a wallet found in defendant's possession at the time of his arrest for an unrelated offense. Defendant argues that the wallet was obtained without a warrant, and it was not seized pursuant to a proper inventory of defendant's belongings, since his other belongings were inventoried immediately upon his incarceration and the wallet was not taken until hours later. Defendant argues the second viewing was improper.

Detective Smith, who had been assigned to investigate the mur-

der, testified that he learned defendant had been arrested and was at the Champaign police department. He said he reviewed the inventory sheet accompanying defendant's arrest record and noticed defendant had a wallet. He said he wanted to look at it, because defendant had told him previously he had lost his wallet. Smith kept the wallet and gave defendant a receipt. Smith admitted he did not have a search warrant.

Defendant filed a motion to suppress the wallet and copies of papers found in the wallet. The trial court ruled the officer's act was proper, based on the supreme court's decision in *People v. Richards* (1983), 94 Ill. 2d 92, 445 N.E.2d 319. There, the court concluded that an arrestee does not retain a reasonable and justifiable expectation of privacy in his personal effects, once the police have legitimately viewed, inventoried and placed them in a police inventory envelope. The court found no search occurred when the police simply looked again at what they had already lawfully seen.

■ Defendant contends that *Richards* is no longer valid, in light of *Illinois v. Lafayette* (1983), 462 U.S. 640, 77 L. Ed. 2d 65, 103 S. Ct. 2605. There, the Court did not address the question of whether police officers could take a second look at inventoried property. Rather, the Court considered the extent or scope of the initial inventory search and whether closed containers could be opened and searched during the inventory. However, defendant maintains that the policy set forth in *Lafayette,* as justifying the original inventory search, does not justify the second search made here. The stated policy justifying the original search was to protect the custodians of the seized property from false claims of theft and to protect them from use of items that might be dangerous. Defendant maintains these purposes do not support the second search made here.

The position of defendant receives some support from a highly respected authority on fourth amendment issues who states:

"There is certainly something to the contention that a 'second look' at what was lawfully seen at the time of inventory does not invade any substantial privacy interest. Yet, by hypothesis the second look must be an intrusion somewhat greater than the first, for otherwise the probable cause would exist in advance of the taking of the second look. It may be that the argument for requiring probable cause is greater when the purpose of the search is to find evidence relating to a crime other than that for which the person is in custody. Permitting a more careful post-booking search to find evidence of the crime for which the arrest was made more clearly relates to what might well

have been done at the time of booking had all the facts and circumstances of the case then been assembled and evaluated. By contrast, permitting a detailed post-booking search through the arrestee's effects to see if he can be linked with some other offense bestows upon the police an undeserved windfall and provides them with a temptation to make subterfuge arrests." 2 W. LaFave, Search and Seizure, §5.3(b), at 496-97 (1987).

Clearly, under *Lafayette*, a possessor of property subject to an original inventory search undergoes a substantial invasion of privacy. Whether the second look at the inventoried property is a greater intrusion not justified under the circumstances here is a question not answered by *Lafayette*. Accordingly, we conclude that *Richards* remains the appropriate precedent. The circuit court properly refused to suppress the evidence of the billfold.

■ Finally, defendant contends the trial court abused its discretion in sentencing him to an extended term of imprisonment for a brutal and heinous murder. Defendant argues that although the evidence shows the victim was beaten to death, there was no evidence that the beating was more brutal than other beatings or that the offense involved exceptionally brutal or heinous behavior.

Defendant notes that, in sentencing defendant, the trial court found there was no mitigating evidence. In aggravation, the court found the victim was intoxicated and unable to defend himself or to present any threat to the defendant. The court further found the "considerable" amount of the victim's blood on defendant's shirt indicated defendant was an active participant in the beating. In addition, the court concluded, based on the substantial injuries to the victim, that the beating was merciless. Thus, the court could properly conclude that the conduct in murdering the deceased was more brutal than that inherent in the offense of murder and could be considered to be exceptionally brutal. See *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138.

For the reasons stated, the decision of the trial court is affirmed.

Affirmed.

LUND and KNECHT, JJ., concur.