543 So.2d 760 (1989)
STATE of Florida, Appellant/Cross-Appellee,
v.
George A. LEWIS, Appellee/Cross-Appellant.
Nos. 87-2308, 87-2309.
District Court of Appeal of Florida, Second District.
February 17, 1989.
On Motion for Rehearing April 26, 1989.
*761 Robert A. Butterworth, Atty. Gen., Tallahassee, and Gary O. Welch, Asst. Atty. Gen., Tampa, and James T. Russell, State Atty., Tampa, and C. Marie King, Asst. State Atty., Clearwater, for appellee/cross-appellant.
Richard J. Preira of Weinstein & Preira, Miami, and Joseph M. Ciarciaglino and Robert L. Paver of Ciarciaglino, Paver & Coyle, St. Petersburg, for appellant/cross-appellee.
*762 SCHEB, Acting Chief Judge.
The state appeals the trial court's award of a new trial for first degree murder (Appeal No. 87-2308) and arrest of judgment of a sexual battery conviction (Appeal No. 87-2309). Defendant George Lewis cross-appeals, charging that the trial court erred in not granting a judgment of acquittal as to the murder charge. We reverse the trial court's order granting a new trial and its arrest of judgment. We reject Lewis's cross-appeal.
Lewis was indicted on April 9, 1986, for the sexual battery and first degree murder of Karen Gregory. Trial was held June 2-14, 1987, in Polk County after a change of venue from Pinellas County. The jury returned verdicts of guilty of both charges and recommended a life sentence for the murder.
At trial the evidence revealed that at the time of her death, the victim, Gregory, was staying at the house of her boyfriend, David Mackey, in Gulfport. Gregory's half nude body was discovered by police on May 24, 1984, after Mackey tried to reach her at his house by phone. When found, she was wearing a sleeveless T-shirt and a black lingerie "teddy" undergarment bunched around her waist and over the T-shirt. There was dried blood on her face and neck, smears of blood on both shoulders, and a bloody handprint on her right thigh with the fingers pointing up. Blood in the hallway where her body was found, in the bedroom, and drips and smears at the front door, together with broken jalousies and a torn window screen, indicated a struggle had taken place.
Neighbors were awakened at 1:15 a.m., May 23, by a scream, but they heard and saw nothing thereafter and did not call police. Lewis claimed that at the time of the scream, he was working in the garage of his home located across the intersection from Mackey's house. Although Lewis, a fireman, often reported suspicious activities in the neighborhood to police, he did not report the scream.
A Gulfport police officer conducting neighborhood interviews telephoned Lewis the morning Gregory's body was found and Lewis gave a handwritten statement the same morning. Lewis said he heard the scream but saw no one, although he walked around the area and looked between cars. He said he had observed two men on bicycles in the afternoon before the scream and again about 11:00 p.m., and after the scream he saw a man who could have been one he saw earlier. Lewis repeated this account numerous times when he was formally and informally interviewed during the next year.
Frank Brentnell, an investigator, testified that he interviewed Lewis on February 7, 1985, at the Gulfport Police Department. Lewis originally denied any knowledge of the homicide and later stated that after he heard a scream, he saw a white male with a beard in Gregory's yard. During another conversation with Brentnell on March 2, 1985, Lewis admitted he had not told Brentnell everything because he was afraid for his wife and child. Lewis then went on to explain that the man he had seen in Gregory's yard warned him not to say anything. Afterwards, Lewis told Detective Lawrence Tosi, the Gulfport police agent assigned to the case and a personal friend of Lewis, that he had seen a 6' to 6'4" red-bearded man running in the victim's front yard the night of the murder. Lewis assisted in the preparation of a composite sketch, and Detective Tosi investigated these leads.
Police conducted a nighttime reconstruction based on the distance and light conditions Lewis described. In the reconstruction, Lewis failed to recognize and identify Detective William Brinkworth, with whom Lewis was acquainted, posing as the man Lewis claimed he met in the front yard. This experiment suggested to police that Lewis could not have observed the characteristics he had previously described due to the environmental conditions. Thereafter, on March 7, 1985, Lewis altered the story he previously gave police by adding that the red-bearded man approached to within three feet of him and threatened him not to say anything.
In 1986, the bloody right footprint found inside the bathroom of Mackey's house was identified by the F.B.I. as Lewis's. Lewis *763 was called for an interview, at which time he changed his story as to the suspect's height and age, making him closer to his own height (5'8"-6'), age, and red hair. Lewis denied that he had gone into the house and stated, as he had previously, that the victim's house was dark. During this interview, Lewis was told that his bare footprint had been identified, but he was not told its location in the house. After being confronted with the information about the footprint, Lewis admitted he had gone inside through the back window, saw Gregory's body with her throat cut open, and left. He denied being barefoot that night.
Through pretrial discovery, Lewis learned where his bloody footprint was found, and at trial, he admitted being barefoot when he entered Mackey's house. He claimed that after he received no response from his knock on the front door, he went to the back of the house and entered through the bedroom window. The person he saw lying on the floor inside did not respond to his calls. He testified that once inside the house, he became ill and ran into the bathroom to vomit in the toilet. The video tape of the scene, however, shows the toilet seat down, and Detective Tosi testified that the toilet bowl and seat were clean when he investigated the scene after the body was found.
Contrary to his pretrial statements and the neighbors' testimony, Lewis asserted at trial that a faint light from the bathroom allowed him to observe the body. He testified that he could not tell what type of injuries Gregory had, despite his earlier statement that he had been able to see her throat cut open.
Testimony at trial established that between midnight and one o'clock on the night of the murder, Gregory left the house of her friend Neverne Covington, stating that she was tired and was going to Mackey's house. Mackey was in Rhode Island on a business trip.
Dr. Joan Wood, the medical examiner who performed an autopsy on Gregory's body, placed the time of death to be the early morning hours of Wednesday, May 23, 1984. This was consistent with the time of the scream heard by the neighbors. In her opinion, the body had not been moved. There was a knife prick wound above Gregory's left breast with a superficial 3" to 4" cut and a similar wound on her neck. There were 13 stab wounds in the neck. She found these wounds to be consistent with a sturdy blade 4" long by 3/4" high by 3/16" to 1/4" wide, such as a buck knife. Although no weapon was located, it was established that Lewis carried a buck knife. Dr. Wood further testified that Gregory had a defensive cut on one hand, a broken finger, and abrasions. Besides two blows causing bursting wounds to the head, she suffered a bruise on her forehead. Gregory bled to death from the knife and head wounds, with the blows to the head contributing.
Police investigators testified that Gregory's body was found in the hallway near the bedroom and the largest blood stain. Another large stain was a few feet away near the bathroom. Bare footprints were apparent, both with the naked eye and with the aid of luminol, around both stains. There was no blood on Gregory's bare feet.
The medical examiner's opinion was that Gregory had been sexually assaulted before her death. She pointed to various facts which indicated that a sexual assault had occurred. Nonmoving sperm cells were found in the vaginal fluid, which probably had been placed there only up to 12 hours before death. There was blood on two separate areas of the bed. Gregory's body was nude from the waist down. The bunched teddy was placed over the T-shirt, there was no diaphragm in the body, and the handprint on the thigh was in a position that could not have been placed there by Gregory herself. Both Mackey and Covington testified that Gregory was conscientious about birth control and always wore a diaphragm for intercourse.
Mackey testified that four or five weeks following the murder, he reported to Detective Tosi that a second teddy undergarment belonging to Gregory, a white one, was missing from the house. Gregory had bought the teddy for her birthday two *764 months before her death. Tonya Dishone, a neighbor of both Gregory and Lewis, said that Lewis gave her a white teddy for her seventeenth birthday during the summer of 1984, when she was having a sexual relationship with him. Dishone testified that she wore it frequently when she was with Lewis. Mackey identified Dishone's white teddy as being exactly like Gregory's.
In addition to testifying on his own behalf, Lewis presented several witnesses at trial. Leroy Partington, a retired St. Petersburg firefighter and paramedic who trained defendant as an emergency medical technician, said that although he had ridden with Lewis only five or six times and could not say how Lewis would react, he knew experienced paramedics to become upset by an accident scene and be unable to perform their duties. He did indicate, however, that it would not be a normal reaction for a trained fireman or paratechnician not to report a body or to try to mislead police. Marie Barrett, one of the paramedics responding to the scene, said that she thought Gregory's body could have been moved as it was more face down on the stomach than as depicted in the photograph the state presented.
Glenda Lewis lived with Lewis at the time of Gregory's death. Subsequently, on December 15, 1984, they were married. She testified that Lewis carried a first aid kit and offered assistance whenever he saw an accident. She said that Lewis's uniform knife usually stayed at work in his locker. On the night of Gregory's death, she was awakened by a scream and noticed that Lewis was not in the house. She looked outside and did not see him. She noticed that her own garage door was open with the lights off. She was frightened and sat in the kitchen waiting for Lewis. At trial, she estimated that she waited about ten minutes, although she had originally told police that it was 20 to 30 minutes before her husband returned. Mrs. Lewis testified that she saw Lewis come up the sidewalk and met him as he came through the utility room into the kitchen. She thought he looked pale and sick. She did not recall whether he was wearing a shirt or shoes. Lewis testified that he had removed a longsleeved shirt and his long pants in the utility room before coming in. Both Mrs. Lewis and Lewis testified that he went back out to the garage to lock up and then took a shower before going to bed.
The court denied Lewis's motion for judgment of acquittal at the close of the evidence, and after deliberation, the jury found Lewis guilty of both sexual battery and first degree murder. Upon review of Lewis's post-trial motions, the trial judge granted an arrest of judgment on the sexual battery count and granted a new trial on the murder count. It is from these orders that the state appeals. We have jurisdiction. Fla.R.App.P. 9.140(c)(1)(C) & (D).

Award of a New Trial on the Murder Count
The trial judge concluded that "[a] review of the record as a whole and the cumulative effect of the errors raised by the defense, leaves the Court to conclude that the best interest of justice requires the granting of a new trial." Instead of delineating the specific grounds on which it based its award of a new trial as envisioned by Florida Rule of Criminal Procedure 3.600, the trial judge identified seventeen different paragraphs in Lewis's motion for new trial as the basis for granting relief. We find that the grounds relied upon by the court are contained in the seven points on appeal argued by the parties.
We recognize that a motion for a new trial is addressed to the sound discretion of the trial court and should not be overturned unless abuse is shown. Baker v. State, 336 So.2d 364, 370 (Fla. 1976). Nevertheless, before a judge should grant such a motion, it must appear that the errors alleged by the defendant seriously affected the fairness of the trial. State v. Coyne, 512 So.2d 221, 222 (Fla. 2d DCA 1987).
The state contends the trial court abused its discretion in granting a new trial and arrest of judgment. We agree. Although new trial orders are generally entitled to great deference, the weight afforded them depends upon whether the decision to grant *765 a new trial was based on the sufficiency of the evidence or on specific legal errors. The strong presumption of correctness is especially great where the trial court has reservations about the strength of the evidence establishing key elements of the crime. See Baker at 370 (new trial order upheld where trial court doubted strength of state's identification of defendant). An order granting a new trial on matters which the trial court viewed as errors of law, however, should be reversed when, on appeal, it is determined that such matters were either not error or were harmless error. State v. Tresvant, 359 So.2d 524, 527 (Fla. 3d DCA 1978), cert. denied, 368 So.2d 1375 (Fla. 1979) (new trial order reversed where appellate court did not find juror misconduct harmful).
The first ground for the new trial concerns admission into evidence of a woman's white "teddy" undergarment presented by the state as circumstantial evidence tending to link Lewis to the scene of the crime. Lewis contended that the teddy was irrelevant and that he was prejudiced by the state's failure to furnish information concerning it on a timely basis. The record indicates that Detective Tosi inadvertently learned of the whereabouts of the white teddy and the identity of Tonya Dishone through an unrelated conversation with Dishone's mother, in early May. Tosi then interviewed Dishone who revealed that Lewis gave the teddy to her as a present two months after Gregory was killed. A few days later, Dishone gave the teddy to Tosi. During the next two weeks, Tosi tried to track down information about the teddy through credit card records, store records, and interviews with various store personnel in the area. He also spoke with numerous people involved in the case, including Mackey, Covington, and Gregory's sister, in an effort to determine the relevance of the garment. The prosecutors explained to the trial judge that they did not realize the importance of the teddy until May 26, when they interviewed Mackey who said, as he was later to testify, that Gregory's white teddy was missing from the house after her body was discovered. Mackey then identified the white teddy as being identical to the one Gregory had owned. The next day, May 27, the state sent the defense information regarding the teddy and witnesses having information about it. Thereafter, on May 29, Detective Tosi was deposed and he explained his investigation of the garment.
Mackey and Dishone testified at trial in accordance with their informal interviews. Although Lewis testified that he purchased the white teddy he gave to Dishone, he was unable to specify where he bought it. Lewis contended that the white teddy was never properly identified as the teddy Gregory had purchased and that it was offered simply for its "shock value" to emphasize his unrelated sexual affair with Dishone.
After an extensive inquiry, the court was satisfied that there was no discovery violation in the state's not having given the defense more advance notice. The judge did say that in his opinion, Detective Tosi and the state could have moved with greater dispatch and that he would give the defense time to evaluate the new evidence. Nevertheless, he felt sanctions were inappropriate. The judge then denied the defense motion for a mistrial and a motion for a continuance.
While introduction of the teddy was obviously prejudicial to Lewis, the prejudice was that which naturally flows from relevant evidence and not a procedural prejudice. As the supreme court observed in Ruffin v. State, 397 So.2d 277, 280 (Fla. 1981), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981), the fact that evidence is prejudicial does not make it inadmissible. The defense knew of the evidence in advance of trial, and witnesses concerning it were made available. Moreover, the court allowed the defense a day and a half extra time to investigate and evaluate this evidence before requiring it to continue. We think the white teddy was relevant and therefore admissible, and no procedural prejudice resulted from the delay. § 90.402, Fla. Stat. (1985). Consequently, there was no error here which justified the court's awarding a new trial.
*766 The state's failure to disclose the existence of victim Gregory's diary was another ground on which Lewis's motion for new trial was based. Defense counsel discovered the existence of the diary on June 4, 1987, when they were reviewing evidence during a trial recess. They noticed an empty paper bag with writing on it which indicated that it had once contained Gregory's personal diary. The next day in court, defense counsel cited the prosecution's failure to tell the defense about the diary, which had been examined by prosecutors and returned to Gregory's family as irrelevant to her murder, as a discovery violation and urged the court to conduct a Richardson hearing and grant a mistrial. The trial court overruled a defense argument that simply because there was a discovery violation, the defense was entitled to the diary but conducted an in camera hearing to determine if the diary was relevant. Defense counsel explained that they wanted the diary to facilitate their investigation of other suspects and theories. Thereafter the court ruled that the defense could review the diary, but could not disclose its contents until they met with the judge.
The state words this issue on appeal: "[Whether] the court abused its discretion in granting [a] new trial on grounds of failure to disclose the victim's diary?" The diary was, in fact, disclosed, even though its disclosure obviously was not in the most convenient manner for the defense. Defense counsel were permitted to read it, to take notes, and were given the opportunity to look at it again. The court made it clear that although the diary would not be admitted into evidence, the defense could use whatever leads they found in it to do further investigation.
Lewis contends that the court forbade his attorneys to disclose the diary's contents to their investigator. However, when asked by defense counsel if they could disclose information to their investigator, the judge answered, "The leads that you generated are a different matter. That is a different thing. What I'm concerned about is the sensitive matters, that they are not to be disclosed, period."
Although Lewis argues on appeal that his counsel objected numerous times to the manner in which they were allowed to read the diary, citations to the record on appeal do not reveal this to be the case. Rather, the defense said that they did not need to retain custody of the diary as they had made notes, but wanted to do some investigation. The court allowed the defense to depose Detective Tosi about his investigation of leads from the diary and ruled that the diary could be used to uncover investigatory leads, although it would not be admitted into evidence.
We have examined Gregory's diary. It includes periodic entries relating to her personal and romantic experiences from 1981 to March 1984. In her diary, Gregory does not indicate that anyone threatened her or that she had any apprehensions of danger. She makes no statements that incriminate anyone. We find that even if the state's failure to apprise Lewis of the existence of the diary could be classified as a discovery violation, the judge conducted an extensive investigation into the matter which, regardless of whether he called it a Richardson hearing, accomplished the same purpose. We think the court took sufficient curative measures. Accordingly, the award of a new trial cannot be supported by the reason offered by the defense and cited by the trial judge.
The judge also cited the admission, over defense objection, of a piece of bloodstained carpet cut from the hallway of Mackey's house as a ground for awarding the new trial. Lewis complained of the admission of a video/audio tape of the luminol test made of the carpet and the in-court demonstration of the luminol reaction of blood. John C. Saunders, a fingerprint specialist for the F.B.I., testified that one of the footprints revealed by the luminol test belonged to Lewis. The state theorized that Lewis's footprint was part of the pattern of bloody prints on the hall carpet and showed that Lewis was the perpetrator. Lewis advanced a chain of custody argument asserting that the carpet was not removed from the house for several *767 months after the killing. Although the carpet was not in the continual custody of police, it was in the Mackey house, which was locked after the crime scene was initially investigated and to which access was available only to the owner, Mackey, law enforcement personnel, and the professional carpet cleaners who rolled up the carpet for storage. All of these people were available as witnesses. No evidence of probable tampering was offered, and we think the question of whether various persons' walking on the carpet might affect the results of the luminol test is a matter which goes to the weight, as opposed to the admissibility, of the evidence. Peek v. State, 395 So.2d 492 (Fla. 1980); cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981). Therefore, we find that the trial judge properly admitted the carpet, and this claim of error by the defense does not support the award of a new trial.
In seeking a new trial, Lewis also complained that the tape of the luminol test was played for the jury and that the jurors were allowed to review it during their deliberations. Lewis contended that the quality of the tape of the luminol testing, which illuminates footprints left in dried blood, was poor. We note, however, that the defense viewed the tape before trial and made no motion to exclude it. Luminol testing is recognized as admissible evidence where, as here, it is relevant. See Johnston v. State, 497 So.2d 863, 870 (Fla. 1986). Technical imperfections alone are not a sufficient basis to have excluded the tape which contained relevant evidence. Odom v. State, 403 So.2d 936, 940 (Fla. 1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982). Such problems affect the weight to be given to the evidence and may properly be explored by the defense, but they do not mandate inadmissibility.
Lewis further argued that the tape was cumulative to photographic evidence, was inflammatory, and that the narrator made speculative conclusions. We find no substance to these contentions, and we find no error in the jury's reviewing of the tape during its deliberations. Fla.R.Crim.P. 3.400, 3.410. Moreover, the defense was not deprived of the right of confrontation as the officers who described the experiment were available for cross examination at trial.
Another basis for the court's award of a new trial was concern over nondisclosure of what Lewis terms an "experiment on visibility" in the dark hallway of Mackey's house. In the summer of 1986, after Lewis was arrested, Detective Tosi checked to determine visibility under certain lighting conditions at the crime scene. In an attempt to verify Lewis' statement to the police that he had seen the victim lying in the dark when he went to investigate the scream he had heard, the detective had an assistant state attorney lie on the floor where the victim's body was discovered. This so-called experiment suggested that Lewis's account was inaccurate. Defense counsel urged that Tosi's actions constituted an "experiment" that was conducted in violation of Florida Rule of Criminal Procedure 3.220(a)(1)(x) and a discovery violation under Rule 3.220(f) because the state did not furnish defense counsel notice of such experiment.
Rule 3.220(a)(1)(x) requires the state to disclose reports or statements of experts, including the results of scientific tests or experiments. Rule 3.220(f) imposes a continuing duty on the state to disclose such matters. Defense counsel requested that the court conduct a Richardson inquiry on this matter. We find that the judge adequately inquired, after which he concluded that there had been no discovery violation.
We agree with the state that the detective's observations were properly admitted into evidence. Detective Tosi's observations about not being able to see a person lying in the hall were no different in kind from his testimony concerning his inability to see his own hand under certain lighting conditions. Additionally, the evidence was merely cumulative. We find that Tosi's testimony, based on his personal observations, does not constitute a scientific test within the meaning of Rule 3.220(a)(1)(x) and was properly admitted.
In granting a new trial, the trial judge incorporated several paragraphs of Lewis's *768 motion for a new trial focusing on five allegedly improper comments. Two of the comments were made by the prosecutor during closing argument. Concerning Lewis's reaction upon leaving the scene of the crime, the prosecutor said, "... the first reaction would be to holler for help instead of walking away and leaving a neighbor to rot." The second comment concerned Lewis's sexual involvement with a sixteen-year-old child shortly after the homicide. The state points out that neither comment was improper argument because there was a basis for each in the evidence. We need not evaluate this contention since neither comment was objected to at trial, and if either was error, it was not fundamental in either instance.
The third allegedly improper comment relates to Lewis's charge that the prosecutor interjected his personal beliefs by stating, "... why we know through other testimony the story is a lie, the one he told yesterday." Lewis moved for a mistrial and curative instruction, both of which were denied by the court. We note that immediately following this comment, the prosecutor alluded to the testimony of several state's witnesses to support his argument. We do not think the prosecutor worded his comment, aimed at Lewis' credibility, in a manner which improperly infused his personal beliefs. In delivering his closing argument, the prosecutor adopted a conversational tone for reviewing the evidence with the jurors by saying "we saw" and "we heard" various evidence. In light of this style, we think it would be obvious to any reasonable juror that the prosecutor's statement that "we know through other testimony the story is a lie" was merely the state's interpretation of the evidence presented at trial. Given the context of the statement, we find no error on this point.
Lewis further argues that the court erred in not declaring a mistrial because of other comments, prefaced by the words "I think" and "I believe," through which the prosecutor allegedly revealed his personal beliefs. We have examined the citations to the record furnished by counsel in support of this contention and find the argument meritless. The prosecutor prefaced statements by "I submit" and in one instance, in commenting on Lewis's varying accounts of his actions at the crime scene, said, "I can't believe that." These comments were not prejudicial.
The fourth allegedly improper comment was made during the defense counsel's cross-examination of state's witness Peter Kumble. In a reaction to a verbal accusation by defense counsel against Kumble, the prosecutor charged that defense counsel "has absolutely no good faith basis to put that on before this jury." After removing the jury, the court concluded that both the defense counsel and the prosecutor were at fault in their comments and denied the request of both for a curative instruction. Although the traded comments by counsel were inappropriate, we do not believe they merit granting Lewis a new trial. See Walker v. State, 273 So.2d 137 (Fla. 2d DCA 1973) (Accusations between counsel alone do not constitute reversible error).
Finally, the motion for new trial alleges error in the court's having denied a defense motion for mistrial based on statements concerning the role of defense counsel. Lewis's motion alleges that the prosecutor in his final argument stated that the job of the defense lawyer was to attack the prosecution, the prosecutors personally, and the police officers personally. Lewis claims that such comment denied him the right to a fair and impartial trial. From our examination of the record, we find the actual comment referred to was the prosecutor's statement, "He [defense counsel] may want to pooh-pooh Joan Wood [the medical examiner], or put her down, as he's done all the rest of us in the trial, which is his job to do as a lawyer, I understand that, and it doesn't bother me. But to suggest that the criminal... ." We note that the prosecutor's comments may have been invited by defense counsel's comment that "[t]his is a case of a bungled crime scene, a pressured investigation, and a desperate prosecution." The trial judge instructed the jury to "disregard the prosecutor's *769 comments on the job of the defense attorney." In view of the heated exchanges occurring between counsel, we think the trial judge handled the matter appropriately by giving a curative instruction.
On appeal Lewis alludes to other statements allegedly made by the prosecutor as being objectionable. However, such statements were not relied on by the trial judge in granting a new trial. Moreover, Lewis urges that the cumulative effect of the allegedly improper comments by the prosecutor is a basis to sustain the trial judge's granting of a new trial. We note, however, that while Lewis urged a new trial be granted on that basis, the trial court rejected that contention.
In sum, two of the five comments were not objected to, and if error, were not fundamental. The remaining three allegedly improper comments were either suitable comments on the evidence or, at most, inappropriate. From our examination of the record, we find that where merited, the trial judge gave a curative instruction. We do not find that Lewis's substantial rights were affected or that any prosecutorial comments deprived him of a fair trial. See Henry v. State, 290 So.2d 73 (Fla. 2d DCA 1974); § 924.33, Fla. Stat. (1985).
Finally, in one of the paragraphs relied on by the trial court in granting a new trial, Lewis contended that it was error to allow Dishone to testify that Lewis carried a knife. The defense contended that the knife was not shown to be consistent with the murder weapon. Dishone described both Lewis's uniform knife and the knife he used to cut sea oats for her at the beach as a folding buck knife. Lewis argues that Dr. Wood, the medical examiner, testified that because of the nature of the wounds inflicted, the murder weapon "could not have been a folding buck knife." As the state indicates in its reply brief, Dr. Wood did not testify that Gregory's stab wounds could not have been made with a folding buck knife. We have examined the record and find that Lewis's reference misstates the record. While Lewis's knife was not admitted into evidence, we think testimony that he carried a knife which, according to the medical examiner's testimony, would be consistent with inflicting the kind of wounds suffered by Gregory, was relevant. We hold, therefore, that it was an abuse of discretion to grant a new trial on this ground.

Arrest of Judgment on the Sexual Battery Count
From the testimony outlined, the trial judge concluded that the evidence supported a prima facie case that Lewis was guilty of first degree murder. Thus, the court denied Lewis's motion for judgment of acquittal and arrest of judgment on that count, yet the court awarded Lewis a new trial based cumulative errors. Even though he denied the motion for judgment of acquittal on the sexual battery count, the trial judge reconsidered and entered an order arresting judgment on that count. We find the evidence as outlined in this opinion shows that there was substantial, competent evidence from which the jury concluded that Lewis committed both first degree murder and sexual battery. Horstman v. State, 530 So.2d 368 (Fla. 2d DCA 1988). Accordingly, it was error for the trial judge to enter the arrest of judgment on the sexual battery count.

Lewis's Cross-Appeal
On cross-appeal, Lewis argues that the trial court abused its discretion in denying his motion for judgment of acquittal on the charge of murder in the first degree. The evidence against Lewis, which we have reviewed and summarized in this opinion, was circumstantial. When a trial court rules on a judgment of acquittal in a case where the evidence against the defendant is circumstantial, it must determine whether the jury might have reasonably concluded that the evidence excluded every reasonable hypothesis but that of guilt. Jackson v. State, 511 So.2d 1047 (Fla. 2d DCA 1987). In this instance, we find that there was substantial, competent evidence that was consistent with Lewis's guilt and inconsistent with any reasonable hypothesis of his innocence. In contrast to Jackson, cited by Lewis, there was sufficient evidence *770 to identify Lewis as being present at the scene of the crime. Lewis's version of the events was in conflict with the state's evidence, and the jury weighed the conflicting evidence and quite obviously chose to disbelieve Lewis. This is the classic role of a trial jury. Jackson at 1048. We find no error in the trial judge's denial of Lewis's motion for acquittal.
Reversed and remanded as to the appeal; affirmed as to the cross appeal.
FRANK and PARKER, JJ., concur.

ON MOTION FOR REHEARING
PER CURIAM.
In response to the appellee's motion for rehearing and the appellant's response, we agree that one sentence of our opinion of February 17, 1989, is not supported by the record. For purposes of clarification, therefore, we delete the first two sentences on page 15, reading "John C. Saunders, a fingerprint specialist for the F.B.I., testified that one of the footprints revealed by the luminol test belonged to Lewis. The state theorized that Lewis's footprint was part of the pattern of bloody prints on the hall carpet and showed that Lewis was the perpetrator." We therefore substitute the following: "John C. Saunders, a fingerprint specialist for the F.B.I., identified the bloody right footprint found inside the bathroom as Lewis's, and the state theorized that Lewis's footprint was part of the pattern of bloody prints on the hall carpet revealed by the luminol. Thus, the state hypothesized that Lewis was the perpetrator."
This factual correction does not affect the holding of our opinion. Otherwise, the appellee's motion for rehearing is denied.
SCHEB, A.C.J., and FRANK and PARKER, JJ., concur.